IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 5:24CR311 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTOPHER J. MACHAMER, | ) | UNITED STATES' RESPONSE IN |
| | ) | OPPOSITION TO DEFENDANT'S |
| Defendant. | ) | MOTION TO DISMISS |

Now comes the United States of America, by its counsel, Carol M. Skutnik, Acting United States Attorney, and Peter E. Daly, Assistant United States Attorney, and submits is response in opposition to Defendants' Motion to Dismiss (ECF # 28: Motion to Dismiss, PageID 78-85). For the following reasons, this Court should deny Defendant's motion.

## I.    FACTS

In September 2023, the Federal Bureau of Investigation (FBI) and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) learned that Defendant was involved in the manufacture and sale of short-barreled rifles[1] without a license. ATF records showed that Defendant had previously held Federal Firearms Licenses permitting him to buy, sell, trade, and manufacture firearms, but that Defendant had closed the businesses related to those licenses, so the licenses were terminated in 2022.

---

[1]     The term "short-barreled rifle," as used herein, refers to a firearm that is a rifle with a barrel less than 16 inches in length and/or a modified rifle, which has a total length of less than 26 inches. Pursuant to 26 U.S.C. § 5861(d), it is illegal for any person to receive or possess a short-barreled rifle which is not registered to him or her in the National Firearms Registration and Transfer Record. Pursuant to 26 U.S.C. § 5861(e), it is illegal for any person to transfer such a weapon without properly registering it in the National Firearms Registration and Transfer Record.

Purchase records showed that between September and November 2023, Defendant purchased at least forty (40) AR-15 upper receivers[2] from a parts manufacturer in North Carolina and at least twenty-eight (28) AR-15 lower receivers[3] from Fin, Feather, Fur, an outdoor equipment store and licensed federal firearms dealer in Canton, Ohio.

On January 4, 2024, investigators executed federal search warrants at Defendant's residence and his parents' residence. Prior to executing the warrants, agents conducted a traffic stop of Defendant's vehicle after he left his residence. In the car, agents recovered five AR-15 style rifles, each with a barrel measuring approximately 9 ¼ inches in length, with no serial numbers. Defendant later admitted that he had made those firearms and that he was on his way to deliver them to a buyer. Defendant further stated that he had an arrangement with the buyer in which Defendant sold the guns to the buyer for $500 each, knowing that the buyer would then sell them to others. Defendant admitted that he had previously sold approximately twelve (12) such firearms to the buyer.

During the search of Defendant's residence, investigators recovered the following items:

- One (1) fully assembled AR-15 style rifle with a barrel measuring approximately 9 ¼ inches, with an obliterated serial number;
- One (1) AR-15 style lower receiver with an obliterated serial number;
- Ten (10) fully assembled AR-15-style rifles with barrels measuring approximately 9 ¼ inches, bearing no serial numbers;
- Nine (9) AR-15-style lower receivers, bearing no serial numbers;

---

[2] An upper receiver is the portion of an AR firearm that connects the barrel, bolt carrier group, and charging handle to the lower receiver of the firearm. An upper receiver is required for the manufacture and assembly of an AR-15 rifle.

[3] A lower receiver is the section of an AR-15 rifle which is considered the actual firearm and is to be required to be serialized. Due to its classification as a firearm, the purchase of lower receivers must go through and FFL.

- One (1) drill press (covered and surrounded in aluminum shavings);
- Two (2) "Ghost Gunner" brand computer numerical control (CNC) mills (both containing aluminum shavings);
- Twenty-five (25) serialized AR-15 style lower receivers;

ATF determined that each of the AR-15 style rifles recovered during the searches of Defendant's vehicle and residence met the definition of a rifle having a barrel or barrels of less than 16 inches in length under 26 U.S.C. § 5845(a)(3). None of the recovered rifles were registered in the National Firearms Registration and Transfer Record, as required under 26 U.S.C. §§ 5841 and 5861(d).

When interviewed by investigators, Defendant admitted manufacturing short-barreled rifles. He stated that typically he would keep approximately fifteen (15) to twenty (20) firearms pre-made and ready for sale. As those firearms sold, Defendant stated he would create more utilizing the Ghost Gunner CNC drill machines and drill press which were located in his residence. Defendant also acknowledged that the firearms were manufactured with barrels under 16 inches in length and admitted knowing the licensing, registration, and marking requirements to manufacture and deal in National Firearms Act firearms such as short-barreled rifles. Defendant further admitted that he had drilled out (obliterated) the serial number on the fully assembled AR-15-style rifle recovered from his residence.

On September 25, 2024, a grand jury for the United States District Court in the Northern District of Ohio returned a five-count indictment charging Defendant with Engaging in the Business of Manufacturing and Dealing Firearms Without a License, in violation of Title 26 U.S.C. §§ 5861(a) and 5871; Making of Firearms in Violation of the National Firearms Act, Title 26 U.S.C. §§ 5822, 5861(f), and 5871; Transfer of Unregistered Firearms, Title 26 U.S.C. §§

5812, 5861(e), and 5871; Possession of Unregistered Firearms, Title 26 U.S.C. §§ 5841, 5861(d), and 5871; Possession of a Firearm with an Obliterated Serial Number, Title 26 U.S.C. §§ 5842, 5861(h), and 5871.  (ECF # 18: Indictment, PageID 45-48).

On January 6, 2025, Defendant filed the instant Motion to Dismiss, alleging that the statutes under which he is charged in the indictment are unconstitutional under the Second Amendment and the United States Supreme Court's holding in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).  Because each of the statutes charged in the indictment are constitutional exercises of Congress' legislative authority, Defendant's claims are without merit and this Court should deny Defendant's motion.

## II.     LAW AND ARGUMENT

### A.  The Supreme Court's Decision in *United States v. Miller* Forecloses Defendant's Challenge to the National Firearms Act's Regulation of Short-barreled Rifles.

Counts One, Two, Three, and Four of the indictment in this case each charge Defendant with violating the National Firearms Act by engaging in conduct involving firearms as defined in 26 U.S.C. § 5845, namely, rifles with a barrel or barrel less than 16 inches in length, commonly referred to as "short-barreled rifles."  *See* 26 U.S.C. § 5845(a)(3).  Defendant argues that the statutes prohibiting such conduct – § 5861(a), (d), (e), and (f) – violate the Second Amendment.  (ECF # 28: Motion to Dismiss, PageID 79-84).  But the Supreme Court determined in *United States v. Miller*, 307 U.S. 174 (1939) that the Second Amendment does not apply to such weapons.  Because *Miller* remains good law after *Bruen*, Defendant's challenges to those statutes are without merit.

4

The National Firearms Act is a comprehensive taxing scheme that regulates the manufacture, sale, transfer, and possession of certain especially dangerous and concealable weapons. Section 5861(d) of the Act makes it a crime to possess "a firearm which is not registered" in the National Firearms Registration and Transfer Record. 26 U.S.C. § 5861(d). The word "firearm" is defined to include certain dangerous weapons, including "a rifle having a barrel or barrels of less than 16 inches in length." 26 U.S.C. § 5845(a)(3).

The Second Amendment protects the "right of the people to keep and bear Arms." U.S. Const., amend. II. "Like most rights," the Supreme Court has explained, "the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* In *Miller*, for example, the Supreme Court upheld the convictions of two men under the National Firearms Act for transporting unregistered short-barreled shotguns in interstate commerce. 307 U.S. at 178. The Court concluded that short-barreled shotguns were outside the scope of the Second Amendment because they bore no "reasonable relationship to the preservation or efficiency of a well-regulated militia." *Id.* When called for service, militiamen "were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *Id.* at 179. The Second Amendment therefore protected only those kinds of arms.

Almost seventy years later, the Court in *Heller* recognized the "important limitation on the right" from *Miller* that "the sorts of weapons protected" by the Second Amendment "were those 'in common use at the time.'" 554 U.S. at 627 (quoting *Miller*, 307 U.S. at 179). In other words, the Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, *such as short-barreled shotguns*." *Id.* at 625 (emphasis added). That limitation, the Court reasoned, was "fairly supported by the historical tradition of

prohibiting the carrying of dangerous and unusual weapons." *Id*. at 627 (internal quotation marks and citations omitted).

More recently, in *Bruen*, the Supreme Court clarified and reiterated the framework for analyzing Second Amendment claims described in *Heller* before holding that New York's discretionary handgun-licensing regime violated the Second Amendment. 597 U.S. at 31. Under the *Bruen* framework, a court must first consider the scope of the Second Amendment. If the Second Amendment's "plain text covers an individual's conduct," the Court explained, "the Constitution presumptively protects that conduct." *Id*. at 24. The government must then justify the regulation "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. Only then does the conduct fall outside the Second Amendment's "unqualified command." *Id*. (internal quotation marks and citation omitted).

In elevating the importance of the historical tradition in Second Amendment analysis, *Bruen* also reinforced the limitations on the kinds of protected weapons that *Heller* recognized. It explained that *Heller* found it "fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons" that the Second Amendment protects only the "possession and use of weapons that are in common use at the time." *Id*. at 21. As Justice Alito wrote in his concurrence, *Bruen* did not "disturb[]" *Heller*, nor did it "decide anything about the kinds of weapons that people may possess." *Id*. at 72 (Alito, J., concurring). And Justice Kavanaugh noted in concurring that "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations," including shall-issue handgun-licensing regimes requiring background checks and firearms-safety courses. *Id*. at 81 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636); see also *id*. at 38 n.9 (majority opinion) ("[N]othing in our analysis should be interpreted to suggest the unconstitutionality" of "shall-issue" licensing regimes,

which are "designed to ensure only that those bearing arms in the jurisdiction" are "law-abiding, responsible citizens.").

*Miller*, *Heller*, and *Bruen* foreclose Defendant's challenges to § 5861(a), (d), (e), and (f). *Miller* upheld the registration requirement for short-barreled shotguns, reasoning that the shotguns fell outside the scope of the Second Amendment because they were not "in common use" at the time and therefore bore no "reasonable relationship" to the Second Amendment's goal of preservation of a well-regulated militia. *Id*. at 178–79. *Heller* and *Bruen* reiterated *Miller*'s holding, explaining that the right to bear arms is not unlimited and extends "only to certain types of weapons." *Heller*, 554 U.S. at 623; see also *Bruen*, 597 U.S. at 21. *Heller* explicitly read *Miller* to hold that the Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, *such as short-barreled shotguns*." *Heller*, 554 U.S. at 625 (emphasis added). And *Bruen* emphasized that the Court in *Heller* had found it "fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons" — the historical approach endorsed by *Bruen* — that the Second Amendment protects the possession only of weapons "in common use at the time." *Bruen*, 597 U.S. at 21. *Miller* undertook precisely the historical inquiry that *Bruen* and *Heller* require.

Although the Sixth Circuit has not considered whether short-barreled rifles are protected by the Second Amendment, appellate courts that have considered the issue after *Heller* have held that they are not. *See*, *e.g.*, *United States v. Cox*, 906 F.3d 1170, 1185 (10th Cir. 2018); *United States v. Stepp-Zafft*, 733 F. App'x 327, 329 (8th Cir. 2018) (unpublished decision). And even post-*Bruen*, district courts across the country have uniformly come to the same conclusion – that short-barreled rifles are dangerous and unusual weapons that do not fall under the protections of

the Second Amendment. *See*, *e.g.*, *United States v. Myers*, 2024WL2924081 at *3-4 (D. Nevada June 10, 2024); *United States v. Miller*, 2023WL6300581 at *4 (N.D. Texas Sept. 27, 2023) (collecting cases); *United States v. Williams*, 695 F.Supp.3d 1295, 1299-1302 (N.D. Okla. Sept. 25, 2023).

Courts considering analogous regulations of short-barreled shotguns have also held they are not protected by the Second Amendment. *See*, e.g., *United States v. Artez*, 290 F. App'x 203, 208 (10th Cir. 2008) (unpublished decision) (noting that the Supreme Court "explicitly stated" in *Heller* that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns"); *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) (holding possession of machine gun and unregistered short-barreled shotgun were not reasonably related to militia service under *Heller*). And, as with short-barreled rifles, district courts have found that *Bruen* did not change that analysis. *See e.g.*, *United States v. Shepherd*, 2024WL71724 at *5-6 (S.D. Mississippi January 5, 2024); *United States v. Saleem*, 659 F.Supp.3d 683, 692-94 (W.D.N.C. March 2, 2023).

Thus, nothing in *Heller* or *Bruen* altered the Supreme Court's holding in *Miller*, which appellate and district courts have consistently relied upon to find that short-barreled rifles like those Defendant manufactured, transferred, and possessed are not "arms" protected by the Second Amendment. *Miller* remains good law, and it is binding. This Court, therefore, should deny Defendant's motion to dismiss the charges in Counts One through Four for manufacturing, dealing, transferring, and possessing unregistered short-barreled rifles.

**B. The Second Amendment Does Not Protect the Right to Manufacture, Transfer, or Possess an Unregistered Short-barreled Rifle.**

Even if this Court considers the issue anew under the *Bruen* framework, the Second Amendment does not protect the right to manufacture, transfer, or possess an unregistered short-barreled rifle. At the first step of the *Bruen* inquiry, the plain text of the Second Amendment does not cover possession of an unregistered short-barreled rifle for two reasons. First, short-barreled rifles are not in common use for lawful purposes and therefore fall outside the scope of the Second Amendment's protection. Second, even if the Second Amendment confers an individual right to manufacture, transfer, or possess a short-barreled rifle, the requirement that the owner register his rifle does not "infringe" the right to bear that arm within the meaning of the Second Amendment. Even if short-barreled rifles are protected by the Second Amendment, the registration requirement would nonetheless be constitutional because § 5861(d) is consistent with the historical tradition of firearm regulation under the second step of the *Bruen* analysis.

**a. The plain text of the Second Amendment does not cover manufacturing, transferring, or possessing an unregistered short-barreled rifle.**

The plain text of the Second Amendment does not cover the manufacture, transfer, or possession of an unregistered short-barreled rifle for two reasons. First, short-barreled rifles are not "in common use" for lawful purposes and therefore fall outside the scope of the Second Amendment's protection. Second, the registration requirement does not "infringe" any right to bear a short-barreled rifle that might exist.

Under step one of the *Bruen* analysis, the court must determine whether the "plain text" of the Second Amendment "covers an individual's conduct." 597 U.S. at 24. To determine whether it does, the court looks at the "normal and ordinary meaning" of the text, as "confirmed by the historical background of the Second Amendment." *Bruen*, 597 U.S. at 20. The *Heller* Court looked to history to inform the meaning of the text because "it has always been widely

9

understood that the Second Amendment codified a *pre-existing* right." *Id*. (emphasis in original). Sources including English history from the late 1600s, American colonial views from the founding, and post-enactment legislative history illuminated "the public understanding" of the legal text around the time it was enacted. *Id*. Those sources indicate that the Second Amendment extends to arms "of the kind in common use." *Miller*, 307 U.S. at 179; *see also Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 21. It "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, *such as short-barreled shotguns*." *Heller*, 554 U.S. at 625 (emphasis added). In other words, it does not protect "dangerous and unusual weapons." *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627).

Under the textual analysis endorsed by *Heller* and *Bruen*, short-barreled rifles are not protected by the Second Amendment because they are dangerous and unusual. Courts have long recognized that short-barreled rifles are "likely to be used for criminal purposes" because they are "concealable weapon[s] likely to be so used." *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992). The Fourth Circuit has observed that short-barreled shotguns, a close analog of short-barreled rifles, are "inherently dangerous and generally lacking usefulness, except for violent and criminal purposes." *United States v. McLaurin*, 764 F.3d 372, 386 (4th Cir. 2014) (quoting *United States v. Fortes*, 141 F.3d 1, 6 (1st Cir. 1998)); *see also Cox*, 906 F.3d at 1185 (noting that a long gun with a shortened barrel is both dangerous, because "its concealability fosters its use in illicit activity," and unusual, "because of its heightened capability to cause damage.") (quoting *United States v. Marzzarella*, 614 F.3d 85, 95 (3d Cir. 2010)).

Second, even if short-barreled rifles were protected by the Second Amendment, the registration requirement does not prevent a person from manufacturing, transferring, or possessing a short-barreled rifle and, therefore, does not "infringe" on the central right protected

10

by the Second Amendment: the right to armed self-defense.  Administrative burdens that stop far short of disarming law-abiding citizens do not "infringe" the right to keep and bear arms.  *See* Webster's 1828 American Dictionary of the English Language (defining "infringe" as "[t]o break; to violate; to transgress" and "[t]o destroy or hinder").  Section 5861(a), (d), (e), and (f) are not a blanket prohibition on firearms, but rather codify the National Firearm Act's registration regime for certain types of firearms, including short-barreled rifles.  *See Cox*, 906 F.3d at 1179 (discussing regime).  Individuals can legally own and transfer short-barreled rifles if they follow the law's registration and taxation requirements.  *See generally* 26 U.S.C. ch. 53.  The Second Amendment protects the right to bear arms for self-defense, but it does not protect an unfettered right to keep and carry "any weapon whatsoever in any manner whatsoever."  *Heller*, 554 U.S. 626–27.

Bruen made clear that laws that regulate firearms licensing and or commerce do not violate the Second Amendment.  *See Bruen*, 597 U.S. at 79–80 (Kavanaugh, J., concurring) (discussing laws that require licensing or training to buy a gun).  Any minimal burden that the registration requirement imposes on the right to self-defense would be even less burdensome than other regulations that *Bruen* indicated do not infringe on that right.  The majority explained that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of the "shall-issue" firearm-carry licensing schemes that existed in 43 states.  597 U.S. at 38 n.9.  "[T]hese shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding responsible citizens.'"  *Id*. (quoting *Heller*, 554 U.S. at 635).  And Justice Kavanaugh emphasized in his concurrence (joined by the Chief Justice) that states can constitutionally require license applicants to "undergo fingerprinting, a background

11

check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 80 (Kavanaugh, J., concurring). If such administrative burdens on the carrying of firearms are permissible, then § 5861's requiring the registration of certain firearms and prior approval to make or transfer such firearms — including short-barreled rifles — is similarly constitutional because it does not "deny ordinary citizens their right" to self-defense. *Id.* at 38 n.9 (majority opinion).

Defendant asserts that § 5861(a) and (f) are unconstitutional because they infringe on an individual's right to acquire firearms by manufacturing them. (ECF # 28: Motion to Dismiss, PageID 81). But as noted above, the statute is not a blanket prohibition on making firearms. Rather, it is an administrative and regulatory framework that applies only to certain firearms because of their dangerous and unusual nature. Defendant could have complied with the registration, approval, and taxation requirements to make, transfer, and possess the short-barreled rifles. He chose not to do so. His choice does not render the statute unconstitutional.

### b. The registration requirement is consistent with the historical tradition of firearm regulation.

Even if short-barreled rifles were protected by the plain text of the Second Amendment, § 5861(d) would be constitutional because it is consistent with the historical tradition of firearms regulation. At the time of the Second Amendment's ratification, regulations of dangerous and unusual weapons were well-accepted. Under English common law, for example, "the offence of riding or going armed, with dangerous or unusual weapons, [was] a crime." 4 William Blackstone, *Commentaries on the Laws of England* 148–49. In the United States, too, courts have long acknowledged that a man commits "an offence at common law" when he "arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to

12

the people." *State v. Langford*, 3 Hawks 381, 383 (N.C. 1824). *See also Bruen*, 597 U.S. at 47

(identifying Colonial-era statutes in the same vein); *Heller*, 554 U.S. at 627.

Regulations targeting the concealment of those weapons that were *not* dangerous and

unusual were also common. *See Bruen*, 597 U.S. at 59 ("The historical evidence from

antebellum America" shows that "States could lawfully eliminate one kind of public carry —

concealed carry — so long as they left open the option to carry openly."); *Robertson v. Baldwin*,

165 U.S. 275, 281–82 (1897) (stating in *dicta* that "the right of the people to keep and bear arms

(article 2) is not infringed by laws prohibiting the carrying of concealed weapons"). The

National Firearms Act seeks to regulate weapons that are "likely to be used for criminal

purposes," *Thompson/Ctr. Arms Co.*, 504 U.S. at 517, and is therefore consistent with the

historical tradition of regulating — even banning— dangerous and unusual concealable weapons.

Laws that tax or regulate firearms sales also have close analogues in our nation's

historical traditions. "[C]olonial governments substantially controlled the firearms trade"

*Teixeira v. Cnty of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017). For example, "a 1652 New

York law outlawed illegal trading of guns, gun powder, and lead by private individuals." Robert

J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law &

Contemp. Probs. 55, 76 (2017). "A 1631 Virginia law required the recording not only of all new

arrivals to the colony, but also 'of arms and munitions.'" *Id*. And in the early 17th century,

Connecticut banned residents from selling firearms outside the colony. *Teixeira*, 873 F.3d at

685. In a similar vein, Virginia provided that people were at "liberty to sell armes and

ammunition to any of his majesties loyall subjects inhabiting this colony." *Id*. at 685 n.18.

Meanwhile, other colonial governments "controlled the conditions of trade" in firearms.

*Id*. at 685. State laws regulated "the manufacture, sale, [and] transport" of guns and ammunition

in the 18th and 19th centuries.  Spitzer, *Gun Law History* at 74.  In 1814, for example, "Massachusetts required that all musket and pistol barrels manufactured in the state be first tested" before sale.  *Id*.  Likewise, in 1820, "New Hampshire created and appointed state gunpowder inspectors to examine every storage and manufacturing site."  *Id*.

Like these early laws, the National Firearms Act's registration requirement for short-barreled rifles does not prohibit possessing or even transferring short-barreled rifles.  Instead, the statute at issue merely imposes record-keeping requirements that ensure safety.  Although § 5861 is not identical to these historical statutes, *Bruen* explained that the government need only identify a "historical analogue, not a historical twin."  597 U.S. at 30 (emphases omitted).  And those statutes evince a similar purpose: regulating sales to ensure public safety.  See *Bruen*, 597 U.S. at 29 (explaining that "how and why" regulations "burden a law-abiding citizen's right to armed self-defense" are relevant metrics for analogical reasoning).

Defendant contends that "there is no historical tradition of regulating the private making of firearms," and that "Congress has focused (as in the Gun Control Act) on regulating the *commercial* sale of firearms."  (*Id*.).  In support of that contention, Defendant claims that "all such restrictions on the manufacture of arms for personal use have been enacted in the last decade."  (*Id*.).  First, that argument ignores the facts of this case.  Defendant was not engaged in the making of firearms for personal use.  The facts, and Defendant's own admissions, demonstrate that Defendant was manufacturing firearms for commercial sale.  In addition, § 5861's regulations regarding the manufacture of certain firearms, far from being "enacted in the last decade," were passed as part of the National Firearms Act in 1934.  And it is not required that the statute have "historical twin."  The analogues discussed above — laws regulating dangerous and unusual weapons and laws regulating commerce and taxation of firearms — are

14

sufficiently similar to support the National Firearms Act's registration requirement. Historical sources show that dangerous and unusual weapons and concealed weapons could be completely banned in the colonial era because of safety concerns. The registration requirement arose out of a similar concern for safety. *Thompson/Ctr. Arms Co.*, 504 U.S. at 517 ("It is of course clear from the face of the Act that the NFA's object was to regulate certain weapons likely to be used for criminal purposes."). And the kinds of commercial regulations that have been common since the founding are closely analogous to the taxation and registration requirements of the National Firearms Act. Requiring the government specifically to show that short-barreled firearms had to be universally registered around 1791 would turn the Second Amendment into the kind of "regulatory straitjacket" that *Bruen* explicitly rejected. 597 U.S. at 30. The registration requirements for short-barreled rifles are consistent with the historical tradition of regulating dangerous and unusual weapons and sales of firearms and are thus constitutional.

Finally, Defendant asserts that the charge in Count Three under 26 U.S.C. § 5861(e), which prohibits the transfer of unregistered firearms, is unconstitutional.[4] In doing so, he cites the district court opinion in *United States v. Quiroz*, 629 F.Supp.3d 511 (W.D. Texas Sept. 19, 2022) (reversed and remanded by *United States v. Quiroz*, 125 F.4th 713 (5th Cir. 2025)), granting a motion to dismiss a charge under 18 U.S.C. § 922(n) for receipt of a firearm by a person under felony indictment. (ECF # 28: Motion to Dismiss, PageID 81-82). In that case, the district court found that § 922(n) reached conduct protected by the Second Amendment because receipt of a firearm "is the condition precedent to possession[.]" *Quiroz*, 629 F.Supp.3d at 516. Defendant asks this Court to find that the transfer of a firearm is likewise part and parcel of possession. But while it may be impossible to possess a firearm without receiving it, one can

---

[4] Defendant mistakenly identifies Count Two as charging the unlawful transfer of unregistered firearms under 26 U.S.C. § 5861(e).

certainly possess a firearm without transferring it. That is, transfer, unlike receipt, is not a "condition precedent" to possession. But even if the transfer of a firearm is protected conduct under the Second Amendment, that is only part of the *Bruen* framework and Defendant fails to reach the second part – the historical analysis. And that is critical here because *Quiroz* dealt with a statute under Title 18, not Title 26. So that court did not address the class of firearms regulated by the NFA, including short-barreled rifles. The historical analysis conducted by that court was, therefore, different than that applicable to NFA firearms and did not address, nor does Defendant, the unique historical framework of that class of dangerous and unusual firearms. Moreover, the Fifth Circuit reversed the district court's finding that § 922(n) is unconstitutional because it found the lower court's historical analysis flawed and concluded that the statute's prohibition on receipt of firearms by persons under indictment "'fits neatly' within our nation's historical tradition of protecting the public from criminal defendants indicted for serious offenses." *Quiroz*, 125 F.4th at 723-24.

### C. The Second Amendment Does Not Protect the Right to Possess a Firearm with an Obliterated Serial Number.

Count Five of the indictment in this case charges Defendant with possessing a firearm, namely, a short-barreled rifle, with an obliterated serial number, in violation of 26 U.S.C. § 5861(h). (ECF # 18: Indictment, PageID 47). Defendant asserts that § 5861(h) is "presumptively unconstitutional," but offers no argument with respect to that section. Instead, Defendant focuses on § 5861(d)'s prohibition against possessing unregistered NFA firearms. In doing so, Defendant cites the language in *Heller* specifically noting that the Second Amendment does not apply to short-barreled firearms, but then argues that because short-barrel rifles are "gaining popularity in the United States," they should be protected under the Second

16

Amendment.  (ECF # 28: Motion to Dismiss, PageID 82-83).  For all of the reasons set forth above, that argument is unavailing.

But Defendant offers no argument as to how § 5861(h) violates the Second Amendment by prohibiting the possession of NFA firearms with obliterated serial numbers.  Indeed, under the *Bruen* framework, § 5861(h) is constitutional.

Possession of a firearm with an obliterated serial number is not protected by the Second Amendment's plain text for at least two reasons.  First, firearms with obliterated serial numbers are not "typically possessed by law-abiding citizens for lawful purposes," even putting aside § 5861(h)'s prohibition on such possession.  *Heller*, 554 U.S. at 625.  As the Third Circuit has observed, "we . . . cannot conceive of a lawful purpose for which a person would prefer an unmarked firearm."  *Marzzarella*, 614 F.3d at 99.  *See* David M. Kennedy et al., *Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and A Use-Reduction Strategy*, 59 Law & Contemp. Probs. 147, 174-75 (Winter 1996) (observing that the only reason to obliterate a serial number is to avoid being connected with a firearm that was stolen, involved in a crime, or obtained in a straw purchase).  Thus, § 5861(h)'s burden "will almost always fall only on those intending to engage in illicit behavior."  *Marzzarella*, 614 F.3d at 99.

Second, § 5861(h)'s prohibition does not "infringe" on the central right protected by the Second Amendment: the right to armed self-defense.  *Heller* "held that individual self-defense is 'the central component' of the Second Amendment right."  *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 599).  But "the presence of a serial number does not impair the use or functioning of a weapon in any way."  *Marzzarella*, 614 F.3d at 94.  Any burden that § 5861(h) imposes on the right to self-defense would be even less burdensome than other regulations that *Bruen* indicated do not infringe on that right.  *Bruen* made clear that

17

"nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of the "shall-issue" firearm-carry licensing schemes that existed in 43 states. 142 S. Ct. at 2138 n.9. The Court explained that "these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding responsible citizens.'" *Id*. (quoting *Heller*, 554 U.S. at 635). And Justice Kavanaugh emphasized in his concurrence (joined by the Chief Justice) that states can constitutionally require license applicants to "undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id*. at 2162 (Kavanaugh, J., concurring). If such administrative burdens on the carrying of firearms are permissible, then § 5861(h)'s ban on possession of NFA firearms with obliterated serial numbers—a small class of hard-to-obtain firearms—is similarly constitutional because it does not "deny ordinary citizens their right to public carry." *Id*. at 2138 n.9 (majority opinion).

### D. Section 5861(h) is Consistent with the Historical Tradition of Firearms Regulation.

Even if the conduct regulated by § 5861(h) were presumptively protected under the Second Amendment's plain text, the statute would be constitutional because it is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. As explained below, § 5861(h) is analogous to historical laws regulating firearms and gunpowder—most notably laws prohibiting alteration of proof marks on gun barrels.

Section 5861(h) is consistent with a variety of historical laws regulating firearms and gunpowder. Well before serial numbers became common, colonial and state legislatures regulated firearms and the firearms trade. *See Teixeira*, 873 F.3d at 685 ("[C]olonial

governments substantially controlled the firearms trade."). For example, Connecticut banned residents from selling firearms outside the colony. *Id*. Virginia provided that people were at "liberty to sell armes and ammunition to any of his majesties loyall subjects *inhabiting this colony*." *Id*. at 685 n.18 (emphasis added; quotation marks omitted). And at least six colonies made it a crime (with severe penalties) to sell or provide firearms or ammunition to Native Americans. *Id*. at 685 (citing 17th-century laws from Massachusetts, Connecticut, Maryland, and Virginia); *see also* 6 Statutes at Large of Pennsylvania from 1682 to 1801 at 319-320 (1899) (1763 law); Laws and Ordinances of New Netherland, 1638-1674 (1868) at 18-19 (1639 ordinance), 47 (1645 ordinance), 278 (1656 ordinance). Although not an exact analogy to § 5861(h), these laws show that colonial legislatures were concerned about the movement of firearms between private parties and the dangers of firearms falling into the wrong hands.

Additionally, several states had laws relating to the inspection and marking of gunpowder, which "was essential to the operation of firearms at that time," meaning that gunpowder regulations "necessarily affected the ability of gun owners to use firearms for self-defense." *Miller et al v. Bonta, et al*., No. 3:19-cv-1537 (S.D. Cal. 2022) (Dkt. 137-3, at 22) (Declaration of Prof. Saul Cornell); *cf. Bruen*, 142 S. Ct. at 2149 (citing article by Cornell). In 1795, Pennsylvania enacted a law requiring gunpowder stored in the public magazine to be proved and marked and prohibiting importation, transfer, or sale of any gunpowder that was not appropriately marked. 3 Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred 240-44 (1810). In 1809, Massachusetts required the inspection of all gunpowder manufactured in the commonwealth or stored in a public magazine, with the inspector marking each cask as either "Massachusetts Inspected Proof" or "Condemned" and adding his name and the year. 2 General Laws of Massachusetts from the Adoption of the

Constitution to February 1822, at 199 (1823).  The law imposed a fine of between $200 and $500 on any person who sold any condemned powder or "fraudulently alter[ed], or deface[d] any mark, or marks, placed by any inspector upon any cask or casks containing gunpowder."  *Id*. New Hampshire adopted a very similar law in 1820.  Laws of the State of New Hampshire; with the Constitutions of the United States and of the State Prefixed 277 (1830).

Colonial and early state governments likewise prohibited the manufacture and transportation of gunpowder without a license.  *See* Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126 (1890) (1651 statute) ("no person . . . shall transport any Gun-powder out of this Jurisdiction, without license first obtained from some two of the Magistrates"); 15 The Public Records of the Colony of Connecticut 191 (1890) (1775 statute) (no "gun-powder made and manufactured . . . shall be exported out of the [Colony] without . . . license"); The Charter and Ordinances of the City of Providence, with the General Assembly Relating to the City 37 (1835) (1821 law) (prohibiting selling gunpowder within the town of Providence "without having a license therefor").

Most importantly, at least two states in the early republic required gun barrels to be proved and marked and prohibited the obliteration of the proof marks.  *See Heller*, 554 U.S. at 605 (observing that examining the "public understanding of a legal text in the period after its enactment or ratification" is "a critical tool of constitutional interpretation" (emphasis omitted)). In 1805, Massachusetts adopted a law for the appointment of "provers of fire arms" to "prove all musket barrels and pistol barrels" presented to them in exchange for a set fee.  Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, at 259 (1807). The law was adopted to prevent firearms from being "introduced into use which are unsafe, and thereby the lives of the citizens be exposed."  *Id*.

Under the Massachusetts law, the prover was required to "stamp" the barrel "within one and an half inches of the breech" with the prover's initials, the letters "P." and "M.," and the year—all in "letters and figures . . . so deeply impressed . . . as that the same cannot be erased or disfigured." Laws of the Commonwealth of Massachusetts, *supra*, at 260. The act imposed a ten-dollar fine on any person who manufactured within the Commonwealth "any musket or pistol, without having the barrels proved and stamped as aforesaid." *Id*. at 260. It also imposed a ten-dollar fine for selling, delivering, or purchasing any unmarked musket or pistol manufactured in the Commonwealth. *Id*. at 260-61. And it imposed a fine of between $20 and $50 for any person who "shall falsely forge or alter the stamp of any prover of fire-arms . . . impressed on any musket or pistol barrel." *Id*. at 261. Massachusetts slightly amended this act in 1814 but kept the provision prohibiting alteration of the prover's stamp. Laws of the Commonwealth of Massachusetts from February 28, 1807 to February 28, 1814 at 536-37 (1814).

Similarly, Maine in 1821 passed a law requiring the appointment of "suitable persons, to be provers of the barrels of all new, or unused firearms." Laws of the State of Maine 546 (1830). Each prover was required (in exchange for compensation) to "prove and try the strength of the barrels of all firearms which shall be offered to him for that purpose, in such manner as to satisfy himself of the strength of the same," to "in a permanent manner, mark and number every barrel by him so proved," and to provide a certificate attesting to the proof. *Id*. The statute imposed a ten-dollar fine on any person who "shall sell or offer for sale within this State, any new, or unused musket, rifle or pistol barrel, without having the same first proved, marked and certified." *Id*. Additionally, it imposed a fine of "not more than one hundred dollars, nor less than twenty

dollars," for any person who "shall falsely alter the stamp or mark or the certificate of any prover of firearms." *Id.*

Although these statutes are not identical to § 5861(h), they are "relevantly similar." *Bruen*, 142 S. Ct. at 2132. *Bruen* made clear that the government need only identify a "historical analogue, not a historical twin." *Id.* at 2133. The ultimate question is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. As explained above, § 5861(h) imposes a minimal "burden on the right of armed self-defense" because marked firearms are ubiquitous and just as effective for self-defense as unmarked firearms. That burden is no greater than the burdens imposed by historical laws relating to the sale and marking of firearms and gunpowder. And neither the historical laws nor § 5861(h) deprived citizens of the use of firearms for self-defense. *See United States v. Holton*, 2022WL16701935, at *5 (N.D. Texas Nov. 3, 2022) (observing that "[n]ot removing the serial number from a firearm" is a "negligible burden" compared to historical restrictions on firearm possession).

Section 5861(h) is also "comparably justified." The historical regulations on commerce in firearms were designed to keep firearms out of the hands of those who might be dangerous, such as (in the view of legislators at the time) Native Americans. And the laws requiring marking of gun barrels and gunpowder were designed to protect citizens from explosions and to allow unsafe barrels or powder to be traced to the inspector who first affixed the markings. Section 5861(h) serves similar purposes by allowing authorities to recover stolen firearms and trace firearms that have been used in a crime. *See Marzzarella*, 614 F.3d at 98; *United States v. Mobley*, 956 F.2d 450, 454 (3d Cir. 1992). Although § 5861(h) does not reflect precisely the

22

same legislative priorities as these historical regulations, it nevertheless imposes a "comparable burden" that is "comparably justified." *Bruen*, 142 S. Ct. at 2133.

## III.     CONCLUSION

Based upon the foregoing, the United States asks this Court to deny Defendant's Motion to Dismiss.

Respectfully submitted,

CAROL M. SKUTNIK
Acting United States Attorney

By:   /s/ Peter E. Daly
        Peter E. Daly (OH: 0084745)
        Assistant United States Attorney
        Federal Building
        2 South Main Street, Room 208
        Akron, OH 44308
        (330) 761-0529
        (330) 375-5492 (facsimile)
        Peter.Daly@usdoj.gov